**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| v. | * | Case No.: GJH-17-590 |
| **TIMOTHY ZACHARY GREEN,** | * | |
| Defendant. | * | |

* * * * * * * * * * * * *

**MEMORANDUM OPINION**

In this case, the Government has charged Timothy Zachary Green with one count of Felon in Possession of a Firearm. ECF No. 1 at 1.[1] Presently pending before the Court is Defendant's Motion to Suppress Evidence. ECF No. 30. The motion has been fully briefed, and an evidentiary hearing was held on July 20, 2018. ECF No. 44. For reasons explained below, Defendant's Motion is denied.

**I.  BACKGROUND**

On June 29, 2017, the Defendant was arrested pursuant to an arrest warrant for a recent armed home invasion, and a firearm was recovered from the area where the Defendant was arrested. On November 6, 2017, the Government filed the Indictment in this case, charging Defendant with one count of Felon in Possession of a Firearm. ECF No. 1 at 1. On April 20, 2018, Defendant filed a Motion to Suppress Evidence, which sought the suppression of the firearm. ECF No. 30. The Government opposed this motion, ECF No. 33, and an evidentiary hearing was held on July 20, 2018. ECF No. 44. At that hearing, the Government presented one

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

1

witness, Sergeant David Hansen, a police officer with the Prince George's County (the "County") Police Department. Hansen is one of the officers who was involved in the arrest of the Defendant, and who recovered the firearm in question. When the Defendant was arrested, Hansen was the supervisor of the County's District 5 Special Assignments Team ("SAT"). The Defendant also presented one witness, his cousin,[2] Alfred William Yates Jr., who owns the property where Defendant was arrested. The Court found the witnesses to be credible, and finds the facts to be consistent with the testimony summarized below and in the discussion that follows.

In late June 2017,[3] a detective forwarded Hansen an arrest warrant for Defendant regarding a recent armed home invasion that had occurred on June 25, 2017, and requested the SAT's assistance in apprehending Defendant. Hansen directed his officers to conduct a criminal history check for Defendant, and to search for any known previous addresses. Hansen's officers informed him that Defendant had a prior felony conviction for a different home invasion.

On June 29, Hansen received a call from a member of the United States Marshals Service, Detective Blount, who had located Defendant driving in a sedan and was following him. Blount followed the Defendant in his vehicle, and continued to communicate with Hansen via their police radios. Blount relayed that the Defendant was driving erratically. At one point, Defendant stopped his vehicle, got out, and confronted another driver in what was described as a "road rage incident." Defendant eventually got back into his car and drove to 6102 Auth Road. When he arrived at the property, Defendant parked his car near the driveway, walked onto the property and sat down at an open-air "gazebo" that was located to the left of the house in the

---
[2] At times, the parties have referred to Yates as the Defendant's uncle. *E.g.* ECF No. 30 at 1. Yates testified that the Defendant occasionally calls him "unc," short for "uncle," but that they are cousins.
[3] Sergeant Hansen testified that this occurred "around the 26th or 27th of June."

yard.[4] Detective Blount parked his unmarked vehicle near the property to continue to surveil the Defendant. The Defendant was seated in front of a table under the gazebo along with Yates.

At this point, Hansen directed officers in marked cars to park near the front and rear of the property, to cover any possible exits. A helicopter flew over the property to give additional surveillance. The officers blocked in the Defendant's parked car with their cars, and officers approached the property simultaneously from the front and rear. Hansen got out of his car, and began to approach the front of a fence that ran along the property; Hansen was the first officer to reach the property and moved quickly along the fence until he arrived at a position where he could fully see the Defendant seated in the gazebo. As he was approaching the fence, Hansen announced the presence of the officers, that the Defendant was under arrest, and that he needed to put his hands above his head. The Defendant immediately stood up and looked around at the officers and the helicopter overhead. He reached into his shorts and pulled out a 9mm handgun, although he was holding it in a non-threatening manner. At this point, Hansen yelled out "gun!" to the other officers nearby him at the front of the property, who had not yet gone over the fence. Hansen was unsure if the officers in the rear of the house had entered the property at this point. After he yelled "gun!", the two officers at the front of the property approached the property and went over the fence. At this point, the Defendant placed the firearm on a shelf in the corner of the gazebo, approximately four feet off the ground. The Defendant then began backing away from the gazebo across the yard, towards a gate in the property's fence. Several officers then apprehended the Defendant in the yard, roughly 25 feet from where he had discarded the firearm. At this point, still on the outside of the fence, Hansen holstered his weapon, jumped over the fence, and walked to the gazebo to retrieve the Defendant's discarded firearm. During this entire

---

[4] At the Motion Hearing, the Government introduced photographs of the gazebo, which is an open-sided structure that consists of four metal pillars and a canvas canopy on top of the gazebo.

time, Yates remained seated in the gazebo, several feet from the firearm. Hansen testified that he went directly to the firearm to secure the scene and ensure officer safety.

Defendant's cousin, Alfred William Yates Jr., the owner of the property at 6102 Auth Road, also testified regarding the events of June 29, 2017, and his relationship with the Defendant. Yates explained that the Defendant comes to Yates's house once or twice a week, and that when he visits they sit, talk, eat, drink, or play games like dominoes; the Defendant has occasionally brought friends to Yates's house with him. The Defendant has been visiting Yates for the past three or four years. However, Yates clarified that while there are three bedrooms in his house, the Defendant does not reside at the house and has never slept over at the house. The Defendant had free rein of the house when he visited, but did not store any items there (e.g., food in the fridge or clothes in the closet). Yates testified that before the officers arrived on June 29, he was not aware that the Defendant brought a firearm to Yates's property and that he never gave him permission to do so.

## II. DISCUSSION

The Defendant argues in his Motion to Suppress Evidence that the police officers' entrance to Yates's property and subsequent seizure of the firearm violated his Fourth Amendment rights, and that the firearm should be suppressed. ECF No. 30.

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018); U.S. Const. amend. IV. The "basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Id.* (quotation omitted). "It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are

presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotation omitted). The Supreme Court, however, has clarified a number of "reasonable exceptions" to the warrant requirement. *Id.* at 459.

Even where officers conduct an unreasonable search or seizure, only the individual whose Fourth Amendment rights were violated may object. That is because "[t]he right to be free from an unreasonable search is personal in nature and cannot be vicariously asserted." *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)). "A search can therefore be unconstitutional with respect to one person, yet the evidence obtained therefrom admissible against a second person." *Id.* at 144–45.

A defendant seeking to suppress evidence that is seized pursuant to a search of another individual's property must show "not only that the search of [the property] was illegal, but also that he had a legitimate expectation of privacy in [the property]."[5] *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). Where an individual seeks to suppress evidence that was obtained from the search of a home in which the individual was temporarily located, "legitimate presence on the premises of the place searched, standing alone, is not enough to accord a reasonable expectation of privacy . . . ." *Byrd v. United States*, 138 S. Ct. 1518 (2018). In *Minnesota v. Olson* and *Minnesota v. Carter*, the Supreme Court established the outer boundaries of when such an individual does or does not have an expectation of privacy. In *Minnesota v. Olson*, the Court found that a defendant's "status as overnight guest is alone enough to show that he had an

---

[5] The Court notes that, at times the Government argued that because the Defendant did not have a reasonable expectation of privacy in Yates's property, he "does not have standing to challenge any alleged search and seizure." ECF No. 33 at 3. In the Supreme Court's recent decision in *Byrd v. United States*, the Court again made clear that while the "concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched," "it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." 138 S. Ct. 1518, 1530 (2018). The Court further instructed that "Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Id.*

expectation of privacy in the home [that was searched]." 495 U.S. 91, 96–97 (1990). *See also Gray*, 491 F.3d at 144 ("The Supreme Court has long held that the relatives of home owners who regularly reside at the residence are protected by the Fourth Amendment."). On the other hand, in *Minnesota v. Carter*, the Court found that defendants had no expectation of privacy where they were present on property "for a business transaction," "were only in the home a matter of hours," and did not have a previous relationship with the homeowner. 525 U.S. 83, 90 (1998).

While the facts of this case lie somewhere in between the extremes of *Olson* and *Carter*, the Court concludes that the Defendant did not have a reasonable expectation of privacy in Yates's property. On the one hand, the Defendant was at Yates's property for more than a simple "business transaction" and had a preexisting relationship with the property and its owner. He had been coming to the property for at least three years, visited at least once a week, his visits were social in nature, and he had a familial relationship with Yates. Yates explained that the Defendant had free rein of the house when he was there. However, it is undeniable that the Defendant was not an overnight guest at the time of the search, had never spent the night, did not store any personal possessions on the property and had not been given permission to bring the illegal firearm onto the property. *See Craddock v. Fisher,* No. 12-430, 2015 WL 1825720, at *7–8 (E.D.Va. April 21, 2015) (analyzing Fourth Amendment claim in civil suit and finding that plaintiff did not have reasonable expectation of privacy in grandmother's house where he visited and engaged in criminal conduct but did not reside.). *Cf. United States v. Pollard*, 215 F.3d 643 (6th Cir. 2000) (reasoning that defendant did have reasonable expectation of privacy in property searched where he "had been staying at the home earlier in the week, . . . occasionally spent the night at the residence and kept some personal belongings in a closet in the living room"). The Court concludes that the Defendant's connections with the property were too tenuous to establish

a Fourth Amendment reasonable expectation of privacy. Thus, he may not challenge the search of Yates's house that led to the recovery of the firearm.[6]

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Evidence, ECF No. 30, is denied. A separate Order shall issue.

Date: <u>August    2 , 2018</u>                                        <u>         /s/                            </u>
                                                                                         GEORGE J. HAZEL
                                                                                         United States District Judge

---

[6] Additional arguments raised by the parties ultimately return to this dispositive issue. For example, while under *Steagald v. United States*, 451 U.S. 204 (1981), a search warrant was likely needed to enter Yates' property to locate the defendant, only Yates could assert the right violated, if any.